Charles C. SCOTT, Plaintiff,

v.

LYKES BROS. STEAMSHIP CO., Inc., Defendant.

Civ. A. No. 5772.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 4, 1957.

Raymond H. Kierr, New Orleans, La., for plaintiff.

Terriberry, Young, Rault & Carroll, William E. Wright, New Orleans, La., for defendant.

J. SKELLY WRIGHT, District Judge.

This case graphically depicts one man's courageous fight for control of his mental and physical faculties after suffering a disabling brain injury which paralyzed his speech process as well as his left arm and leg, already badly broken in the accident. By determined and continuous application of modern methods of rehabilitation under supervision, this plaintiff seaman has delivered himself from the life of a gibbering, hopeless, helpless cripple to that of a functional human being, able to speak, to walk, to work, and even to contain himself after months of being fitted with an artificial evacuation receptacle. The defendant maintains that the plaintiff, admittedly injured in the service of his ship, is not entitled to maintenance during this period of rehabilitation, that the ship's obligation to pay maintenance ended when plaintiff's condition became medically "static," and that the plaintiff was on his own during that period of time required to relearn to speak, to walk, to use his hands, to be a useful human being. This court holds that maximum cure, as defined by the Supreme Court,[1] is not achieved by the administration of pills and poultices alone, that maximum cure is reached, in the circumstances of this case, when, through the application of modern methods of rehabilitation under medical supervision, the seaman is returned, as near as may be, to the status of a functional human being.

On December 26, 1951, Scott, while employed as a member of the crew of the defendant's S. S. Dr. Lykes and while that vessel was in port at San Pedro, California, was injured when a taxicab in which he was returning to the vessel was struck by a railroad train. In the accident Scott received a severe brain injury in addition to fractures of his left leg and left arm in the area of the elbow. For three months after the accident, Scott was in a coma as a result of a cerebral contusion. On finally being discharged from the United States Public Health Service Hospital on December 3, 1953, he was left with an inability to speak intelligibly, a left arm rigid with a 90° bend at the elbow, a useless left hand held in a clutched position, a left leg shortened and bent rigidly in place at the knee, and an inability to control his urine. At this time, December 3, 1953, the medical officer at the hospital advised the defendant that "Although I have not examined Mr. Charles C. Scott for several weeks, it is my opinion that he has probably reached a static situation as far as improvement is concerned." On receipt of this information from the hospital, the defendant terminated Scott's maintenance.

On April 1, 1954, Scott was again re-admitted to the Public Health Service Hospital with a history of spells of unconsciousness. His brain syndrome at this time was diagnosed as Grand Mal. He was discharged from the hospital on April 26, 1954, with a prescription and a supply of Dilantin, which is a drug administered for the control and treatment of seizures. At this time Scott decided to return to his native state of Virginia to reside with his mother at Newport News. There he applied for admission to the Virginia State Rehabilitation Hospital near Staunton, Virginia, and after a medical examination on July 5, 1954,

1. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Aguilar v. Standard Oil Company, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

to determine his eligibility for and receptivity to rehabilitation treatment, he was admitted on November 21, 1954. He remained at that hospital until March 3, 1955, at which time his mother, though working, was no longer able to pay for his keep there. On leaving the hospital, it was recommended to Scott that he continue his therapeutic exercises and that he seek some sheltered rehabilitation employment which would supplement the training in leg motion and manual dexterity he was given at the hospital. Consequently, on May 10, 1955, he commenced a six-month trial period of limited work as a handicapped person in the assembly plant of an aluminum window frame fabricator in Warwick, Virginia. He earned $900.

Thereafter Scott returned to his mother's home and continued to perform the therapeutic exercises he had been taught to improve his speech, incontinence, leg motion and manual dexterity. On October 15, 1956, through the intercession of a friend with political connections whom he had met at the aluminum assembly plant, he was readmitted to the Virginia State Rehabilitation Hospital as a nonpaying patient. At the time of the trial he was still a patient at that hospital undergoing physiotherapy, speech training and other exercises designed to improve his physical and mental condition.

As a result of Scott's determined efforts under medical supervision to rehabilitate himself, he is now able to speak audibly and intelligibly. He can use his left hand and arm to tie and untie his shoes, his necktie, and even to put on his own cuff links. He has completely conquered his incontinence, and, while his left leg is still one inch short, much of the stiffness is gone from his knee. Although Scott will never be a normal person physically, he has made incredible strides toward overcoming his handicaps. He is enthusiastic. He is willing to work and he has tried to work, particularly and unceasingly at the exercises required to restore his body functions. He has found great satisfaction in religion and feels that he has had more than human help in his recovery. In short, he is a far different human being, mentally and physically, than the inarticulate, helpless cripple who was discharged from the Public Service Hospital on December 3, 1953, as having "reached a static situation as far as improvement is concerned." Under the circumstances, he had not reached maximum cure on that day but has continued to improve and there remains the possibility of further improvement. Farrell v. United States, supra; Aguilar v. Standard Oil Company, supra; Calmar Steamship Corp. v. Taylor, supra. He is, therefore, entitled to maintenance to the date of trial, excluding those days spent in hospitals. He is also entitled to recover the money expended for his treatment at the Virginia State Rehabilitation Hospital. The defendant is entitled to a credit in the amount of $900 which was earned by Scott during the period of his rehabilitation.

The defendant, citing cases previously decided by this court,[2] contends that if additional maintenance is due, it should be at the rate of $6 per day rather than $8 since $6 was the going, or contract, rate at the time of his injury. It is true that this court has, on occasion, used as a guide the going rate of maintenance at the time of the injury or inception of the illness. But here the defendant itself has determined that a rate of $8 per day is a proper one and has paid plaintiff maintenance at that rate up to December 3, 1953. There appears no good reason why the defendant's judgment in this regard should be disturbed.

Plaintiff's claim against defendant for failure to pay maintenance is denied as is his claim for reimbursement of $2,000 paid defendant by agreement out of proceeds of his settlement with third persons allegedly responsible in tort for his injuries.

Judgment for plaintiff.

2. Lamon v. Standard Oil Co., D.C., 117 F. Supp. 831, 1954 A.M.C. 473.