**Albert L. BROWNING**

v.

**UNITED STATES of America.**

**Civ. A. No. 71–563.**

United States District Court,
E. D. Pennsylvania.

June 6, 1973.

---

25. *See* notes 6 & 21 *supra.*

26. E. Lazarus, "The New Colossus" (1883).

18

Robert C. Daniels, Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

John A. McMenamin, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for defendant.

OPINION AND ORDER

EDWARD R. BECKER, District Judge.

This is a seaman's personal injury case. Jurisdiction is founded upon the

law of admiralty modified by the Suits in Admiralty Act, 46 U.S.C. §§ 741–752 and the Public Vessels Act, 46 U.S.C. §§ 781–790. During the trial it was agreed that plaintiff had no claim against the operator of the vessel, Mathiasen's Tanker Industries, Inc. (Mathiasen's), and consequently, Mathiasen's was dismissed as a party defendant with prejudice.[1] Because there is no right to a trial by jury in suits against the United States arising under the Public Vessels Act, the case was tried to the Court. This opinion constitutes our findings of fact and conclusions of law under F.R. Civ.P. 52(a).

## I. *Liability*

### A. *Findings of Fact*

Between the early 1960's and March 29, 1970, Albert Browning (plaintiff) served aboard various United States flag merchant vessels in the capacity and job classifications of Chief Electrician, Electrician, Second Pumpman, and Engine Mechanic. On March 14, 1970, he joined the U.S.N.S. MISSION SANTA CRUZ, a public vessel owned by United States of America (defendant), in the capacity of Second Pumpman. On the evening of March 29, 1970, while the ship was in Port Neches, Texas, plaintiff was ordered by one of his superiors aboard the vessel to disassemble and overhaul the main economizer valve atop the port boiler in the fire room, since it and many of the lines that were connected to it were leaking. Pursuant to that order, plaintiff, sometime between 8:00 P.M. and 10:00 P.M. on that evening, commenced the work of removing the main economizer valve from its position on top of the port boiler.

In order to disassemble the economizer valve, plaintiff was required to position himself with his left foot placed on the edge of the fire room's after catwalk and his right foot placed on the collar of

the port boiler itself. Plaintiff was required to position himself in such a manner because there was no catwalk in between the port and starboard boilers (although there was a catwalk both forward and aft of the boilers). The only access route or work area between the port and starboard boilers was a long wooden scaffolding board which extended from the forward catwalk to the after catwalk. This long wooden scaffolding board was not a permanent part of the vessel's structure or appliances but was only a temporary scaffolding or staging that had been rigged by members of the crew prior to the time that plaintiff joined the U.S.N.S. MISSION SANTA CRUZ. The long wooden scaffolding board was rigged in such a manner that the forward portion of the board rested on the solid mesh or lattice-styled steel surface of the forward catwalk. However, the after-end of the long wooden scaffolding board rested only on the inside edge or inside angle iron of the after catwalk, because a three foot square area of the mesh or lattice work steel surface of the after catwalk had been cut out and removed from the precise area where the aftermost portion of the long wooden scaffolding board extended to. Therefore, there was nothing but an empty space or open hole beneath the very aftermost portion or overhang of the long wooden scaffolding board in question.

While plaintiff was situated in the manner described and began to loosen the economizer valve in question, some hot water began to escape from the valve. This occurred because the port boiler had not been properly and adequately shut down or turned off, with all lines drained, as it should have been by plaintiff's superiors aboard the vessel before plaintiff was directed to begin the work. In attempting to avoid being hit by this hot water, the plaintiff stepped backwards with his right foot

---

1. In Petition of the United States, 367 F.2d 505 (3d Cir. 1966), the Court of Appeals held that the exclusivity clause of 46 U.S.C. § 745 precludes recovery against the operator of the public vessel where the Public Vessels Act provides a remedy against the United States.

onto the aftermost portion of the long wooden scaffolding board. The weight of his body caused the board to teeter downward like a seesaw, thereby throwing him off balance and down through the empty three foot square opening or hole that was present in the after catwalk and down to the steel floor plates of the fire room, some twenty-five feet below. As plaintiff started to fall, he struck the entire right side of his body and lacerated his right hip area on the jagged edges of the cut out area through which he fell in the after catwalk. On the way down he struck his right hip, shoulders, back, neck and head on steel pipes, other machinery, and equipment which were permanent fixtures in the fire room and upon the steel floor plates of the fire room itself, thereby sustaining serious personal injuries.

The long wooden scaffolding board teetered downward at its after-end because it was not properly or adequately secured or lashed, at its forward end, to the forward catwalk. When plaintiff stepped backwards onto the aftermost portion of this long wooden scaffolding board with his right foot to avoid the escaping hot water, he thought and believed (because of previous observations) that the long wooden board was lashed down and safe to stand upon, and had no reason to believe—at the moment of his accident—that the board would teeter and cause him to lose his balance.

■ ■ Although defendant did not call a single witness in its liability defense, it has argued that the evidence justifies the conclusions that plaintiff should have: (1) insisted on the assistance of an oiler and/or wiper in connection with the task at hand; (2) ascertained for himself whether or not the main economizer line had been shut down; and (3) checked the lashing on the scaffolding plank. To the contrary, we find that: (1) the work that plaintiff was doing at the moment of the accident did not require the services of more than one man; (2) plaintiff, having received the order to perform the work, had the right to assume that the

line had been shut down and had no independent duty to inspect the line; and (3) as noted above, plaintiff was reasonable in believing that the plank was secure.

### B. *Conclusions of Law*

We first conclude that on March 29, 1970, at the time and place that plaintiff was injured, the U.S.N.S. MISSION SANTA CRUZ was unseaworthy by reason of the presence of the following unsafe and dangerous conditions in the fire room aboard the vessel:

(a) A port boiler that was not properly and adequately shut down and turned off and whose lines were not drained, which permitted hot water to escape through the main economizer valve—on top of the port boiler—that plaintiff was disassembling and removing;

(b) A long wooden scaffolding board that was rigged between the forward catwalk and the after catwalk which was not secured or lashed down in any way in that the lashing had been removed from the forward end of the scaffolding board at the forward catwalk, and whose after end was not supported by any firm or solid surface of any kind but overhung an empty space (the cut out portion of the after catwalk);

(c) A three foot square opening or hole in the after catwalk which had been cut out and allowed to remain, thereby providing no support for the very aftermost portion of the long wooden scaffolding board;

(d) The absence of any permanent structure, scaffold or other piece of equipment that was reasonably fit for plaintiff to stand or walk upon while performing his assigned function of disassembling and removing the main economizer valve from its position on top of the port boiler.

We conclude that the port boiler and its main economizer valve, the long wooden scaffolding board, and the after catwalk with a three foot square opening or hole,

in the condition that they were at the time and place of plaintiff's accident and injuries, were unseaworthy in that they were not reasonably fit for their intended purpose or use at that time or place.[2]

Secondly, we find that defendant was negligent, through its agents, officers, servants, and employees, and breached its duty to exercise reasonable care to provide plaintiff with a reasonably safe place[3] within which to perform his duties by allowing and permitting the following conditions to exist aboard the U.S.N.S. MISSION SANTA CRUZ on March 29, 1970:

(a) A port boiler that was not properly and adequately shut down and turned off and whose lines were not drained (in breach of defendant's duty to plaintiff), which permitted hot water to escape through the main economizer valve—on top of the port boiler—that plaintiff was disassembling and removing;

(b) A long wooden scaffolding board that was rigged between the forward catwalk and the after catwalk, which was not secured or lashed down in any way in that the lashing had been removed from the forward end of the scaffolding board at the forward catwalk, and whose after end was not supported by any firm or solid surface of any kind but overhung an empty space (the cut out portion of the after catwalk);

(c) A three foot square opening or hole in the after catwalk which had been cut out and allowed to remain, even prior to the time that plaintiff joined the vessel, thereby providing no support for the very aftermost portion of the long wooden scaffolding board;

(d) The absence of any permanent structure, scaffold or other piece of equipment that was reasonably fit for plaintiff to stand or walk upon while engaged in performing his assigned function of disassembling and removing the main economizer valve from its position on top of the port boiler.

In addition to the foregoing, we conclude that: (1) both the unseaworthiness of the vessel and the negligence of defendant were a proximate cause of plaintiff's injuries and damages; and (2) plaintiff was not contributorily negligent in any degree. Since the foregoing findings of fact and conclusions of law require that a verdict be rendered for plaintiff on liability, we turn to our findings of fact and conclusions of law on the question of damages.

## II. *Damages*

### A. *Introduction*

Although defendant has formally contested the issue of liability in the case, the principal issue at trial was that of damages. With the exceptions noted,[4] the extent of the damages was seriously contested. Plaintiff's evidence was that as the result of the accident, he has developed a severe post-traumatic neurosis of a mixed type, manifested by anxiety and depression (the latter phase causing a suicide attempt) which has permanently disabled him from sea duty. Plaintiff contends that the neurosis has also created a severe alcoholic problem, that he is unfit for anything but sporadic shoreside work and that, without extended psychiatric treatment which he is

2. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Earles v. Union Barge Line Corp., Nos. 72–1313, –1314 (3d Cir. May 23, 1973).

3. See Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960); Earles v. Union Barge Line. Corp., *supra.*

4. The parties agreed that defendant had sustained multiple abrasions and contusions, and certain soft tissue injuries to his neck and back of considerable severity, and that with respect to these injuries, he was fit for duty as of January 1, 1971, some nine months after the accident. And, while the matter did not assume any great significance in the case, the parties were essentially in agreement that defendant had sustained a cerebral concussion followed by a post-concussion syndrome.

now willing to undergo (his previous failure to seek it was, plaintiff submits, a function of the mental illness itself), he will be permanently disabled from any steady work even shoreside. Plaintiff is fifty years of age. The magnitude of his claims is reflected by his proposed findings of fact in which he asserts that he is entitled to recover the sum of $59,751.29 for past loss of earnings and the sum of $168,691.19 (*after* reduction to present worth) for future loss of earning capacity, or a total of $228,442,48 for his earnings loss alone.

In defendant's view plaintiff's claims are grossly exaggerated. The psychiatrist who examined plaintiff on behalf of defendant testifed that plaintiff did not suffer a post-traumatic neurosis or any other psychiatric sequelae of the accident. In defendant's view, plaintiff has an unstable, sociopathic personality, was alcohol addictive prior to the accident, has exaggerated his complaints, and is a malingerer who lied under oath about them. Moreover, defendant's counsel introduced evidence designed to show that plaintiff is a person with an irresponsible life style and that his difficulties following the accident were totally unrelated to the accident.

As is often the case, the truth lies somewhere in between the extreme contentions of the parties. As will be seen, we credit the testimony of Harold Dillon, M.D., plaintiff's psychiatrist, that plaintiff sustained a post-traumatic neurosis of some severity as a result of the accident, and that plaintiff is not and will not be able to perform the duties of a merchant seaman. However, other evidence persuades us that the condition is not as disabling as Dr. Dillon testified; indeed, we find that plaintiff is able at the present time to engage in gainful shoreside employment. Because plaintiff's injuries were serious, and because the condition which Dr. Dillon described has had a marked effect upon his life and earning capacity, we will render an award that is substantially greater than if we were to accept defendant's version of the facts, although very substantially less than plaintiff's submission. Our findings of fact and conclusions of law on the subject of damages follow.

B.  *Findings of Fact*
    1.  *The early phases of plaintiff's injuries and his orthopedic condition*

During plaintiff's fall of some 25 feet, he struck his right hip, shoulders, back, neck and head on steel pipes and other machinery and equipment, ultimately falling to the steel floor plates in the fire room. His right hip area was also lacerated by the jagged edges of the hole in the mesh through which he fell. Plaintiff was unable to get up and walk at that time. He was assisted from the fire room by some of his fellow crew members and was removed from the vessel by means of a stretcher. He was then transported by ambulance to the Park Place Hospital in Port Arthur, Texas, where he underwent x-ray examination and received emergency treatment during the late night hours of March 29, 1970. On the same night, plaintiff was transported by ambulance to the United States Public Health Service (USPHS) clinic in Port Arthur, where it was noted that his pain was "quite marked," and he was found not fit for duty and transferred to the USPHS Hospital in Galveston, Texas.

Plaintiff was admitted as an inpatient to the USPHS Hospital in Galveston on March 30, 1970, with complaints of pain "over his lower right back, right flank, right neck and right head" and "headaches on the left side." He was discharged on March 31, 1970, as fit for duty, with a discharge diagnosis of "multiple abrasions and contusions." Plaintiff rejoined the U.S.N.S. MISSION SANTA CRUZ on April 1, 1970. After working for one and a half days aboard the vessel following his return, he was unable, because of multiple aches and pains, general malaise, headaches, dizziness and limited mobility, to continue performing his duties as Second Pumpman. Plaintiff remained confined to his bed between April 2 and April 8, 1970, performing none of his work du-

ties aboard the vessel, because of the continued pain, difficulties and problems with his hips, back, elbow, chest, and head and his headaches and dizziness. On April 8, 1970, plaintiff left the U.S. N.S. MISSION SANTA CRUZ and was examined on behalf of the defendant by Dr. Chien-Min Chen in Portsmouth, New Hampshire. As a result of Dr. Chen's examination of plaintiff, who at the time had the same complaints, he was found not fit for duty and was advised to report to the USPHS Hospital in Baltimore, Maryland.

Plaintiff reported to the USPHS Hospital in Baltimore on April 9, 1970, and was admitted as an inpatient on that date for cervical strain, lumbosacral strain, headaches (all post-traumatic) and degenerative osteoarthritis of the thoracic spine. Plaintiff remained hospitalized as an inpatient from April 9 to May 12, 1970, during which time he suffered considerable pain and discomfort as a result of headaches, dizziness, decreased visual acuity, bruises, contusions and strains of the neck, back, hips, chest and the entire right side of his body. During plaintiff's inpatient hospitalization, he also suffered from extreme nervousness and anxiety for which he received medication, i. e., valium, nembutal and thorazine. However, during the period of his inpatient hospitalization he did not receive any actual or active psychiatric medical care or treatment. Following plaintiff's release as an inpatient on May 12, 1970, he was followed as an outpatient at the same USPHS facility in Baltimore. Between May 13 and July 24, 1970, plaintiff continued on a regimen of physical therapy and heat treatments for his post-traumatic cervical and lumbosacral strains.

After July 24, 1970, plaintiff was seen periodically on an outpatient basis at the USPHS clinic in Baltimore. He was declared fit for duty by the USPHS as of January 1, 1971. Plaintiff was also examined by Jacob Krause, M.D., an orthopedic surgeon in Philadelphia. Dr. Krause was in accord with this declaration, for when he examined plaintiff on February 26, 1971, he found his neck and low back complaints to be without orthopedic foundation. However, Dr. Krause did express the opinion that plaintiff had a serious neurologic and psychiatric problem. During the entire period of plaintiff's treatment at the USPHS Hospital and Clinic at Baltimore, Maryland between April 9, 1970, and January 1, 1971, he received no psychiatric medical care, attention, or treatment as such, but only the prescription of certain medications generally prescribed to treat anxiety and general nervousness.

2. *Plaintiff's Psychiatric Problem and Its Effect on His Earning Capacity*

Plaintiff testified that as a result of the failure of the USPHS to provide him with any medical care for his emotional difficulties, he consulted a private psychiatrist, Dr. Harold Dillon, on September 16, 1970. Actually, the appointment with Dr. Dillon was arranged by plaintiff's counsel. At that time plaintiff was complaining of headaches and continuous pain in his low back, across both shoulders and up the back of his neck. He also complained of nervous difficulties, including irritability and concern about his financial situation and about the fact that his physical ailments were impairing his ability to live the active life to which he was accustomed. Plaintiff indicated that he had suffered a weight loss of 27 pounds from the date of his accident to the date of this examination. Dr. Dillon concluded that plaintiff was tense, anxious and under much emotional tension, prescribed Valium, and requested that plaintiff return on October 8, 1970, for further consultation and therapy. Dr. Dillon continued to treat plaintiff with medication and psychotherapy on a periodic basis thereafter between October 8, 1970, and May 31, 1971, during which time plaintiff showed improvement in his general overall emotional state, although he continued to complain of headaches, anxiety, lightheadedness and pain in his back, neck and shoulders. Throughout this

period plaintiff displayed anxiety about his inability to return to full-time work, his fear of returning to work and especially of returning to work on a ship, his inability to do any lifting such as was required of him in his shipboard employment, and his general inability to function in the manner to which he was accustomed. However, in his report to plaintiff's counsel on June 12, 1971, Dr. Dillon's sole diagnosis was cerebral concussion and post-concussion syndrome.

When Dr. Dillon next saw plaintiff on July 17, 1971, plaintiff's mental and emotional condition had begun to deteriorate. On that date plaintiff again complained of neck, back and shoulder pain, headaches, dizzy spells and depression; he also indicated that he could not work, did not feel right, had no ambition, did not care for "nothing" and "just felt like committing suicide sometimes." As a result of his consultation, Dr. Dillon increased plaintiff's medication and prescribed certain other medications. When Dr. Dillon next saw plaintiff on September 10, 1971, plaintiff was again complaining of pain in his neck and the back of his head and was depressed and still not working. Plaintiff again was losing weight and his emotional and mental condition was worse. Plaintiff had a tremendous fear of going back to work at sea and of going back to regular work of any kind. We find, in accordance with Dr. Dillon's testimony, that plaintiff's headaches, depression, tension and irritability were all components and manifestations of a post-traumatic neurosis, stemming from the accident of March 29, 1970.

On September 24, 1971, plaintiff ingested an overdose of three different medications in a suicide attempt. He was found at his home in a comatose state, removed by ambulance, and admitted in critical condition to the intensive care unit of the Baltimore City Hospital. He was unconscious for at least 48 hours. Plaintiff remained hospitalized until October 4, 1971. During his hospitalization he was attended by the hospital staff, a psychiatrist, and a social worker who discussed his depression and his drinking problem, which had become serious after the accident. The parties hotly disputed the claim that the suicide attempt was a result of the post-traumatic neurosis. We credit Dr. Dillon's testimony and find that it was at least one contributing factor.

Although Dr. Dillon sent plaintiff an appointment card for a visit after his discharge from the hospital, plaintiff did not appear, and Dr. Dillon did not see him again until February 23, 1973, when this case appeared in the Court's trial pool. Dr. Dillon's final diagnosis at that time was that plaintiff was suffering from a serious neurosis of a mixed type, manifested by anxiety and depression and repression to an infantile state of dependence (upon the old friends with whom plaintiff has been living in Warren, Ohio).[5] As we have noted, Dr. Dillon also described the neurosis as post-traumatic, attributing it to the emotional impact resulting from the 25-foot fall. His prognosis was that, without regular psychotherapy, there was "not much hope for him for the future," but that with about two years of intensive psychotherapy and the proper motivation, he could function in a regular employment capacity, although not as a merchant seaman. Dr. Dillon attributed plaintiff's increased alcohol dependence to the neurotic condition. Although Dr. Theodore Kushner, defendant's psychiatrist (who testified by deposition), expressed the opinion that plaintiff was suffering not from a neurosis, but from an unstable sociopathic alcohol-addictive personality unrelated to

---

5. Defendant argues in its post-trial brief that plaintiff should not be able to recover damages for the period between his discharge from Baltimore City Hospital and the time he resumed psychiatric treatment because of a failure to mitigate damages. We reject this argument because we find, based upon Dr. Dillon's testimony, that the general rejection of treatment during the period was a manifestation of plaintiff's mental illness. As a witness at trial, plaintiff testified that he was now willing to accept psychiatric help (see text *infra*).

the accident, we credit Dr. Dillon's diagnosis and prognosis.[6] We turn then to what is for us the central issue in the case—plaintiff's past and future loss of earnings. In this discussion, we note the extent to which we do not credit certain of Dr. Dillon's conclusions about plaintiff's loss of earning capacity.

Despite plaintiff's condition, he was not totally disabled from working after the accident. Indeed, he worked sporadically at shoreside employment in late 1970, and in February 1971 he was employed for almost four months by North Point Steel Company in Baltimore as a spray painter. His work there was considered satisfactory. Plaintiff held a variety of other jobs in 1971, both before and after his suicide attempt, working as a press operator, inspector and truck driver. His earnings for 1970 after the accident were $704.25 and his earnings in 1971 were $3008.84. Plaintiff testified that he held only one job in 1972 (as a press operator), earning less than $1,000. At present he works two or three days a week driving a truck for the man with whose family he lives, hauling steel from Warren, Ohio to Cleveland and other points, and earning $30 per trip.

Plaintiff testified that a significant factor in his inability to sustain regular employment was back and neck pain and general inability to perform heavy labor. This testimony is discredited, in our view, by the testimony of his employers during 1971 (who said that his problem was drinking and unreliability, not physical disabilities) and of his neighbors and companions in the Baltimore area. Two neighbors (Mrs. Maxwell and Mrs. Erdos) testified that they frequently saw plaintiff perform arduous labor around his home without apparent difficulty. Evelyn Shafer, a woman with whom plaintiff lived for part of 1972, corroborated this fact and gave additional damaging testimony.[7] First, she testified to plaintiff's employment in Smyrna, Delaware, which he otherwise denied. Secondly, she testified that she saw plaintiff move his heavy boat by hand. Finally, Mrs. Shafer testified that when she moved to West Virginia, plaintiff performed the moving chores, even to the extent of lifting her washing machine onto a truck. And she also testified that plaintiff told her that his back would be better "when his case was settled."

Because it had the ring of truth, we credit this testimony as to plaintiff's ability to undertake physical labor, noting, however, that it is not inconsistent with the conclusions of Dr. Dillon, for Dr. Dillon noted that people suffering from neuroses are not necessarily disabled from employment. We find too that plaintiff was less than candid both on depositions [8] and on the witness stand with respect to his employment record, and that he has not worked to his full capacity pending the disposi-

---

6. Defendant objected at trial to the admissibility of Dr. Dillon's recitation of the history given him by plaintiff, arguing that where a psychiatrist examines a person solely in anticipation of litigation, then the history given by the person is not admissible in evidence; in other words, that the physician's opinion must be based upon facts not derived from the subject. In support of this objection, defendant relied upon Petition of United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970). While the Third Circuit has not yet addressed the question, we find it unnecessary to rule on it because we find that Dr. Dillon was in fact a treating physician. The fact that plaintiff was referred to Dr. Dillon by his attorney does not inveigh against this conclusion.

7. We see no need to make findings regarding the rather seamy story of life in the trailer camp where plaintiff was living, the details of his drinking bouts, and so on. We do note that Mrs. Shafer's deceased husband had been plaintiff's best friend. Indeed, plaintiff's despondency over Charles Shafer's death was supposedly one of the major ingredients in plaintiff's suicide attempt; yet plaintiff commenced living with widow Shafer shortly thereafter. In response to a pointed question by the Court, Dr. Dillon testified that such a liaison was consistent with plaintiff's illness and regression to a dependent state.

8. Plaintiff did not reveal the full extent of his post-accident employment in depositions.

tion of this litigation. This finding does not, in our view, mean that Dr. Dillon's diagnosis was incorrect, for neurotics, like others, can be evasive or mendacious, or partakers of secondary gain. We find that plaintiff's neurotic condition as manifested by his anxiety, depression, irritability, and·increased alcohol dependence has adversely affected his earning capacity and prevented him from working full time. Dr. Dillon testified that, with close supportive psychotherapy for approximately two years, plaintiff could hold a full time shoreside job. We accept this testimony and note in this regard that plaintiff is a highly skilled mechanic as well as a competent truck driver. But we also note our agreement with Dr. Dillon's conclusion that psychotherapy will not overcome the plaintiff's genuine and deep-rooted fear of seagoing duty engendered by the awesome 25-foot fireroom fall.

Against this background, we now turn to our calculations as to plaintiff's loss of past earnings and future earning capacity.

### 3. Findings on Plaintiff's Loss of Earnings and Earning Capacity

Our findings as to plaintiff's orthopedic and psychiatric injuries compel us to conclude that he has sustained a significant loss of earnings and earning capacity. This loss stems not only from peri-ods of total and partial disability as such, but also from the fact that plaintiff's earning capacity at shoreside employment is less than that at seagoing employment, particularly in view of the higher pay that seamen have gained through negotiation of their union contract over the past several years. We will first consider the evidence of what plaintiff's earnings would have been.

■ Louis Parise, the Philadelphia branch agent of the National Maritime Union (NMU), presented a chart of the union scale compensation of a second pumpman (plaintiff's principal rating), showing basic monthly wage, compulsory and additional overtime, and vacation and holiday pay, for contract years both prior and subsequent to the accident, thus showing annual incremental increases in the contract.[9] Plaintiff's counsel has calculated these figures in terms of monthly and yearly amounts and has thereby asserted that, for the current NMU contract year, for example, plaintiff's earnings would be $2,726.40 per month for eight months,[10] or a total of $21,811.20 per year.[11] On the other hand, plaintiff's actual earnings as shown by his Federal income tax returns, which include all of the items mentioned by Parise except pension and welfare contributions (see note 9) for the four years prior to the accident, were as follows: 1966—$9,221.49;

9. The schedule also showed pension and welfare contributions made by the employer, including increments in subsequent union contracts. Plaintiff has asked that we include pension and welfare contributions in determining his losses. The parties agree that there has been no decided case squarely confronting the issue whether pension and welfare contributions not made during a seaman's disability constitute a cognizable loss in a seaman's personal injury case. In Trovatten v. United States, 342 F.Supp. 866 (E.D. Pa.1972), also a Public Vessels Act case, our respected colleague Judge E. Mac Troutman filed findings of.fact in which he considered lost pension and welfare benefits as a pecuniary loss. However, the record in that case has not been available to us and we do not know how the plaintiff developed that issue or even whether the parties stipulated with respect to it. We decline to include lost pension and welfare contributions in plaintiff's damages, not because we do not consider them cognizable, but because plaintiff has not made a sufficient record on the subject. More specifically, while the record does contain the amount of monthly contributions, there is no evidence on the actuarial value of the benefit which plaintiff would expect to receive from such contributions. Only the latter would determine the amount of the loss, if loss were proven.

10. Actually, plaintiff's sea service record showed only 150 days in 1969, the year before the accident.

11. Plaintiff has made no claim for loss of "found," i. e., the value of plaintiff's food and lodging while aboard ship.

1967—$6,434.87; 1968—$9,352.59; and 1969—$7,880.00. During 1970 he earned $2,941.08 up until April 8, 1970.[12] Defendant argues that the actual earnings figures constitute the proper base for calculations, and we agree, for we find no reason to believe that plaintiff, who was 47 years old at the time of the accident, would have increased his earning capacity (except for increases gained in new union contracts, which we will include) above the levels of the four years previous to his accident.

From the NMU contract data we find that had plaintiff worked in the 1970 contract year (commencing June 16, 1970)[13] he would have earned 9.5% more than in the previous contract year. In the four contract years thereafter, the annual increments are 7.7%, 5.5%, 4.4%, and 4.5% respectively. Plaintiff does not ask us to project incremental increases beyond that but asks only damages for loss of earning capacity at the 1974 contract year rate for his work life expectancy of 15 years (he is now nearly 50 years of age). Working from what we consider the proper base, *i. e.*, average yearly earnings of $9,000 as of the date of the accident, we find that plaintiff's earning capacity as a seaman was $9,855 for contract year 1970, $10,614 for contract year 1971, $11,198 for contract year 1972, $11,691 for contract year 1973, and $12,217 for contract year 1974 and each year thereafter for the balance of plaintiff's 15-year work life expectancy.

As to the amount plaintiff will be able to earn despite the accident, we do not believe, for the reasons we noted above, that his actual post-accident earnings accurately reflect his shoreside earnings capacity. Considering plaintiff's considerable skills as a mechanic and truck driver,[14] we find that his earning capacity shoreside is $150 per week.[15] We further find that he will, in conformity with his testimony at trial, seek psychotherapeutic help and will return to full-time shoreside employment after June 1975.[16]

From the foregoing findings, we calculate plaintiff's loss of earnings and earning capacity as follows. *First,* we find that plaintiff was virtually totally disabled from the date of the accident[17] to March 1, 1971 (we have noted that his earnings were only $704.-95 in 1970 after the accident), and that from that date through the end of 1971 he worked to his then capacity, earning only $3008.74. His earnings loss from the accident to December 31, 1971, was $12,800 (the difference between the amount we find he would have earned as a seafarer ($16,500) and what he did earn ($3,700) ). *Second,* we find that from January 1, 1972, until June 1, 1975, plaintiff was and will be capable of working shoreside as a skilled mechanic or truck driver earning $150 per week for at least 40 weeks per year, or $6,000 per year. We calculate plaintiff's losses from January 1, 1972, to May 31, 1975, by deducting what we believe he is

---

12. Although the accident occurred on March 29, 1970, he was paid until April 8, 1970. *According to the evidence,* plaintiff also had an occasional shoreside job during his recent years as a merchant seaman.

13. The NMU contract year commences on June 16, the effective date of each yearly union contract. The income tax returns are, of course, on a calendar year basis, but we have made appropriate adjustments.

14. Indeed, in the late 1950's, plaintiff owned as well as drove a tractor-trailer rig.

15. Plaintiff has asserted (see Plaintiff's Requests for Findings of Fact #103) that he will have an earning capacity of $150 per week when he is recovered. For the reasons noted in the text, we find that plaintiff has this capacity already. In view of plaintiff's skills, this estimate may well be conservative; however, defendant made no attempt to show that plaintiff's earning capacity is greater than $150 per week.

16. Plaintiff's Request for Findings of Fact #104 encompasses and adopts this thought.

17. He was, however, paid until April 8, 1970.

capable of earning shoreside from that which he would have earned at sea, reducing future losses to present worth at 6%. These losses total $17,500. *Third*, from June 1, 1975, until October 13, 1987, at which time plaintiff will have reached age 65 and the end of his work life expectancy, we find that he will be able to engage in full time shoreside work earning $8,200 per year (he is capable of earning $150 per week or $7800 per year now, and we posit some increment, though smaller than the seafaring increment), but because he will earn less than as a seaman (he would average $12,217 per year), we find plaintiff's earnings loss will be $4,000 per year or a total of $49,300, which, reduced to present worth at 6% simple interest, amounts to $37,283.

### 4. *Medical Expenses*

As a merchant seaman, plaintiff is entitled to receive free medical care from the USPHS, and, except with respect to his mental illness, he has received it. The question of an award for medical expenses (past and future) arises only because plaintiff was not offered psychiatric care at USPHS and thereupon incurred expenses for private psychiatric care, and because he will need intensive psychotherapy for at least two years in the future.

█ █ It is clear that a merchant seaman is obliged to accept and undergo treatment at the USPHS. However, this rule is subject to certain exceptions: For example, if private medical treatment gives a seaman benefits he could not obtain by recourse to a public health facility, then the cost of private medical treatment is recoverable by him. McManus v. Marine Transport, Lines, Inc., 149 F.2d 969 (2d Cir. 1949). And the fact that a facility of the USPHS certifies that a seaman is "fit for duty" does not preclude that seaman from proving that he was in fact disabled and in need of treatment. Labenz v. National Shipping and Trading Corp., 153 F.Supp. 785

(E.D.Pa.1957). In such circumstances he would be entitled to recover the money spent by him for private medical treatment, even though the USPHS had previously certified him as "fit for duty." *See* Scott v. Lykes Bros. S.S. Co., 152 F.Supp. 104 (E.D.La.1957).

█ We first address the question of plaintiff's entitlement to recover the sum of $700 representing the bill of Dr. Dillon for psychiatric services.[18] Psychiatric care and treatment was not offered to plaintiff by the USPHS either before or after his suicide attempt for which he was hospitalized in the USPHS facility in Baltimore, even though, at least during his second inpatient stay, the USPHS officials were aware of his psychiatric problem. In Nunes v. Farrell Lines, Inc., 129 F.Supp. 147 (D. Mass.1955), the plaintiff sought to recover for bills of his private physician and hospital in connection with the insertion of a plate to cover a hole in his skull. In awarding the merchant seaman the amount of his private medical expenses, the Court found that "[t]here is no evidence that the Marine Hospital had either suggested or offered to place the plate in the plaintiff's skull." 129 F.Supp. at 147. We elect to follow *Nunes*, and find that plaintiff is entitled to recover the amount of Dr. Dillon's bill in these circumstances, i. e., where the plaintiff desired the treatment and the treatment in question was reasonably necessary.

█ We turn then to the question whether plaintiff can recover the value of the future psychiatric care which he requires. No record was developed at trial as to whether the future psychiatric care needed by plaintiff is available at USPHS. We asked the parties, following post-trial argument, to determine from USPHS whether outpatient psychiatric care is available at USPHS facilities geographically accessible to plaintiff. The parties have agreed that such care is available at Baltimore, as well as at Staten Island and Norfolk, Virginia,

---

18. The reasonableness of Dr. Dillon's bill is not in issue.

but not at Cleveland, which is the only USPHS facility geographically accessible to plaintiff's present home. However, an even greater obstacle than geographic distance confronts any efforts by plaintiff to obtain psychiatric treatment at a USPHS facility. That obstacle stems from 42 C.F.R. § 32.17, which provides:

> Where more than 90 days have elapsed since an applicant's last service as a seaman and he can show that he has not definitely changed his occupation, such period of time shall not exclude him from receiving care and treatment (a) if due to closure of navigation or economic conditions resulting in decreased shipping with consequent lack of opportunity to ship or (b) in the event the applicant has been receiving treatment at other than Service expense.

It is far more than 90 days since plaintiff's last service as a merchant seaman and he cannot show that he has not changed his occupation, for he has. Since plaintiff is therefore not eligible for USPHS outpatient psychiatric treatment and is also not geographically accessible thereto, we find that he is entitled to recover the sum of $2,160, representing the cost of future medical expenses necessary to improve his condition.

### 5. *Pain and Suffering*

We have described the nature of plaintiff's injuries in some detail. We find that these injuries were the efficient and producing cause of physical pain and mental anguish. The initial phase of plaintiff's injury was particularly painful, as is demonstrated by the comments in the Port Arthur clinic record, the heavy medication administered to him while the ship was en route to New England and later at the USPHS Hospital in Baltimore, and his own testimony. Indeed, the 25-foot fall through the jagged hole to the steel plates below was a horrendous experience in and of itself. We find that plaintiff is entitled to receive the sum of $7,500 for his pain and suffering during the initial phases—until he was orthopedically fit for duty. During the latter phase of plaintiff's injuries, as manifested by his psychiatric problems, he suffered more than a modicum of mental anguish in the form of depression, fear, anxiety and tension. At times the mental suffering was intense. At most times, however, it was only moderate, alleviated by medication. Or, it was accommodated by plaintiff's regressive life style which mollified his distress. While the anxiety and depression will continue to some degree in the future, we believe that it will be greatly minimized by the aid and insight obtained from psychotherapy. We find that plaintiff is entitled to the sum of $6,500 to compensate him for pain and suffering, past and future, in the latter phase of his injuries, or a total of $14,000 for pain and suffering.

### C. *Conclusions of Law*

In addition to the conclusions of law set forth in the liability section of this Opinion, we find that the accident which plaintiff suffered on March 29, 1970, was a proximate cause of the personal injuries and damages that we have set forth in our findings of fact on damages. In summary, we conclude that plaintiff is entitled to recover: (1) the sum of $67,583 for past loss of earnings and future loss of earning capacity; (2) the sum of $700 for past medical expense and the sum of $2,160 for future medical expense; and (3) the sum of $14,000 for past and future pain and suffering, or a total of $84,443.